## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARSHA MOORE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No. 08 CV 5180** |
| | ) | |
| **MICHAEL ASTRUE**, | ) | **Magistrate Judge Young B. Kim** |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | **May 27, 2010** |

### MEMORANDUM OPINION and ORDER

Before the court are the parties' cross-motions for summary judgment. Marsha Moore

seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") under

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382c, claiming that her persistent severe

migraine headaches and lower back pain render her disabled. The Commissioner of Social

Security issued a final decision denying her claims, and Moore appeals. *See* 42 U.S.C. §§

405(g), 1383(c). For the following reasons, Moore's motion is granted and the

Commissioner's is denied. This case is remanded for further proceedings consistent with this

opinion.

### Procedural History

Moore applied for DIB and SSI in December 2005, claiming that her disability began

on January 15, 2003. (A.R. 98, 101.) The Social Security Administration denied her claim

initially and on reconsideration. (Id. at 39-40.) Moore then requested, and was granted, a

hearing before an administrative law judge ("ALJ"). (Id. at 6.) The ALJ concluded that

Moore was not "disabled" as defined in the Social Security Act. (Id. at 56.) When the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Moore then filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. §§ 405(g), 1383(c). The parties have consented to the jurisdiction of the United States Magistrate Judge. *See* 28 U.S.C. § 636(c).

## Facts

In her applications for DIB and SSI, Moore claimed that her disability began on January 15, 2003, when she was fired from her job as an ophthalmology technician because of excessive absenteeism brought on by her persistent and debilitating migraine headaches. (A.R. 14, 98, 101.) She also claimed that the side-effects of her migraine medication adversely impact her ability to work, and that she suffers from increasingly severe low back pain. (Id. at 12, 32.) At her hearing before an ALJ, Moore provided both documentary and testimonial evidence to support her claims.

A. Moore's Evidence

Moore testified that the most serious of her impairments are her migraine headaches, which arrive without warning up to three times per week. (A.R. 14, 21.) Her primary care physician, Dr. Merrill Zahtz, prescribes Imitrex pills to treat the migraines once they appear, but she is unable to tolerate medicine that in some people prevents migraines. (Id. at 15-17, 20.) When Moore has a migraine, she is "laid out for the day," and has to lie down in a dark

room with white noise until the headache subsides.  (Id. at 15.)  It usually takes two hours for the Imitrex to work, and even after it reduces the headache, her sensations are heightened uncomfortably and she feels tired and physically drained.  (Id. at 15, 20.)  Moore also testified that she experiences panic attacks with every migraine, which cause a painful tightening in her chest that can last up to eight hours.  (Id. at 23-24.)  Dr. Zahtz prescribes Klonopin to control the panic attacks.  (Id. at 20.)  She explained that her medications can cause her to experience rapid heartbeat or sleepiness, and based on those side effects, she let her drivers' license lapse two years earlier.  (Id. at 13, 24, 32.)  Moore explained that her typical migraine lasts only a couple of hours, but stated that she has experienced headaches that last up to three days.  (Id. at 31.)  Moore testified that she cannot predict the onset of a migraine, but that bright sunlight, flashing lights, and stress are all triggers.  (Id. at 14, 29-31.)

The ALJ questioned Moore about what additional steps she was taking to reduce the impact of her migraines.  Moore testified that she had cut caffeine and chocolate out of her diet, but she admitted that she still smokes a pack of cigarettes about every three days, despite Dr. Zahtz's suggestion that quitting smoking might help reduce the migraines.  (A.R. 18-19, 30.)  She also testified that she had seen only one neurologist about her migraines, and that was years before the hearing.  (Id. at 15-16.)  Moore explained that the neurologist had not prescribed any treatment that varied from Dr. Zahtz's, so she did not think returning would be beneficial.  (Id. at 16.)  She testified that she had sought emergency-room treatment for

a migraine only once, and the ALJ noted that there was no record of that visit in the evidence she submitted.  (Id. at 19.)

To support her testimony describing her migraines, Moore submitted medical records from Dr. Zahtz and Dr. Scott Kale, an internist who performed a consultative examination. Dr. Zahtz's treatment records show that he treated Moore for migraines beginning in October 2002.  (A.R. 239-40.)  In March 2006 he noted that Moore complained that her headaches were occurring two to five times per week.  (Id. at 246.)  He prescribed Imitrex and Soma. (Id.)  In 2007 he described Moore's prognosis as "very guarded" based in part on "recurrent severe migraines."  (Id. at 231.)  Similarly, Dr. Kale noted that he examined Moore in March 2006 and that she complained of increasingly severe and frequent migraines that occurred three to four times per week.  (Id. at 175.)  Moore told Dr. Kale that the headaches prevented her from concentrating or being able to tolerate light or sound.  (Id.)  Dr. Kale diagnosed Moore as suffering from "uncontrolled migraines by history" and "status migrainosus."  (Id. at 178.)

In addition to the evidence regarding her migraine headaches, Moore testified that she suffered from debilitating lower back, knee, and shoulder pain.  (A.R. 22.)  She testified that she has three extra vertebrae and decreased cushioning in her spine, which causes constant lower back pain.  (Id. at 18, 22.)  She stated that her knee and shoulder pain come and go depending on her physical activity and stress levels.  (Id. at 22-23.)  She explained that her orthopedist, Dr. Patrick Schuette, prescribes Vicodin and Dr. Zahtz prescribes a muscle

relaxant to treat her pain. (Id. at 17-18, 20.) When the ALJ asked about her daily activities, Moore testified that she spends 80% of her day lying on a heating pad while she watches tv or reads in short intervals. (Id. at 25-26.) She explained that she rarely cooks and does not clean, do laundry, or go to the grocery store (her fiancé does most of the household chores). (Id.) She testified that the last time she traveled was in January 2003, but she spent most of the trip in bed with migraines and did not do any sight-seeing. (Id. at 27-28.) The ALJ noted that Dr. Schuette had advised her to exercise to increase her strength level, but Moore testified that walking exacerbates her knee pain. (Id. at 24.) The ALJ also noted that Dr. Schuette wanted her to try decreasing her Vicodin intake, but Moore explained that she takes only the Vicodin dosage that Dr. Schuette prescribes. (Id. at 17.)

Moore offered medical records from Drs. Schuette and Kale and from Cook County Hospital in support of her testimony regarding her back, knee, and shoulder pain. The Cook County Hospital records show that between March 2004 and October 2006 Moore was treated for symptoms of sciatica, lower back pain, and left hip/lower extremity pain. (A.R. 198-203.) Those records also note that Moore complained of migraine headaches. (Id. at 203.) An MRI of Moore's spine in October 2006 showed minimal degenerative disc disease. (Id. at 204.)

Dr. Schuette's treatment records cover the period from July 2003 through October 2006. In her initial visit with Dr. Schuette, Moore complained of intermittent lower back pain and some left hip and upper thigh pain, as well as periodic muscle pain on the left side

of her body.  (A.R. 224.)  She reported that the pain grew much worse after activity, and at times was severe enough to wake her from a sound sleep.  (Id.)  She also reported a history of migraine headaches.  (Id.)  Dr. Schuette noted that Moore has rotary scoliosis and could lift her leg to only 85, rather than 90, degrees.  (Id. at 224-25.)  He prescribed Bextra and Soma to treat Moore's pain, but warned Moore that Soma could negatively impact her cognitive functioning.  (Id. at 225.)  In August 2003 Dr. Schuette noted that x-rays of Moore's lumbar spine showed no significant abnormalities, but stated that "Moore has persistent back pain."  (Id. at 221.)  Dr. Schuette counseled Moore about the long-term use of narcotics like Vicodin, but said that she was "clearly in a fair amount of pain" that needed management.  (Id.)  He also noted that Moore's lack of health insurance was complicating her ability to get treatment.  (Id.)  In January 2004 Dr. Schuette noted that Moore continued to complain of back pain that radiated into her left hip and leg but that the etiology of the pain was unclear.  (Id. at 217.)  He again noted that determining the etiology of her pain was "complicated by the inability to get an adequate workup performed given her insurance status."  (Id.)  Moore's pain persisted and in June 2005 Dr. Schuette noted that x-rays, a CAT scan, and an MRI of the lumbar spine did not reveal any specific abnormalities.  (Id. at 213.)  He diagnosed modest scoliosis with muscle pain as the etiology of Moore's back pain, and noted his hope that she would "push the envelope" in trying to exercise and cut back on her Vicodin use.  (Id. at 213-14.)  He reduced her Vicodin dosage in 2004 and 2005.  (Id. at 213, 216.)  In his last treatment notes in October 2006 Dr. Schuette noted that Moore's lower back

pain was "quite significant" and "persistent," and that she "continues to require fairly high doses of Vicodin as ongoing treatment." (Id. at 212.)

Following his March 2006 consultative examination of Moore, Dr. Kale noted that Moore complained of low back pain, but could stand and walk normally. (A.R. 175.) Dr. Kale diagnosed low back pain with "sciatic features," with "no objective abnormalities." (Id. at 178.)

At the hearing Moore also submitted residual functional capacity assessments completed by Drs. Zahtz and Schuette. Both doctors noted that Moore needs to lie down intermittently throughout the day, and Dr. Zahtz opined that Moore cannot sit at all during a work day when she has a migraine. (A.R. 210, 232.) They both noted Moore's sensitivity to temperature and opined regarding limitations in her ability to reach or carry more than five pounds occasionally. (Id. at 210-11, 232-33.) Both doctors also described limitations caused by the side effects of Moore's medicine: Dr. Schuette noted that "machines would be a problem" because of her Vicodin use, and Dr. Zahtz stated that her migraine medication causes weakness, lethargy, hearing and speech impairment, and panic attacks. (Id. at 211, 233.) Although Dr. Schuette referred to Moore's prognosis as "fair," (Id. at 209), both doctors concluded that her symptoms would markedly limit her ability to: "complete a normal workday and workweek without interruptions . . . [and] perform at a consistent pace without an unreasonable number and length of rest periods." (Id. at 211, 233.) They agreed that

Moore would "reasonably be expected to experience significant deficiencies in sustained concentration, persistence and pace." (Id. at 211, 233.)

B.    The Vocational Expert's Testimony

Following Moore's testimony the ALJ called a vocational expert, James Radke, to describe Moore's past work and to opine about other jobs she might perform, assuming certain hypothetical limitations. Radke described Moore's past work as an ophthalmology technician as "light and skilled." (A.R. 33.) The ALJ then asked Radke to assume an individual who is 43 years old (Moore's age at the time), with Moore's tenth-grade education and limitations of doing only light work, lifting and carrying 10 pounds frequently, and occasionally stooping, crawling, climbing, crouching, and kneeling, with the need to avoid "concentrated exposure to pulmonary irritants and temperature extremes." (Id. at 33-34.) Radke testified that a person with those limitations could work as an ophthalmology technician. (Id. at 34.) Radke further opined that a person with those limitations could work in food preparation or as a mail clerk, courier, or receptionist, and that thousands of those jobs existed in the region where Moore lived. (Id. at 34-35.)

C.    The ALJ's Decision

After considering the proffered evidence, the ALJ concluded that Moore is not disabled. In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520, which requires her to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or

equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has a severe impairment which does not meet the listings, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence."  20 C.F.R. § 404.1520(e).  The ALJ then uses the residual functional capacity to determine at steps four and five whether the claimant can return to her past work or to different available work.  *Id.* § 404.1520(f), (g).  It is the claimant's burden to prove that she has a severe impairment that prevents her from performing past relevant work.  42 U.S.C. § 423(d)(2)(A); *Clifford*, 227 F.3d at 868.

Here, the ALJ determined at steps one and two of the analysis that Moore had been unemployed since January 13, 2005, and that she had a severe combination of impairments consisting of lower back pain, migraine headaches, "possible Vicodin abuse," and "possible anxiety disorder."  (A.R. 48.)  At step three the ALJ determined that Moore had only mild restrictions in daily living, social functioning, and concentration, persistence, or pace, and thus concluded that her impairments did not meet or medically equal any listed impairment.  (Id. at 49-50.)

Proceeding to step four of the analysis, the ALJ determined that Moore has a residual functional capacity "to perform light work except that she is limited to occasional stooping,

9

crawling, climbing, crouching and kneeling; she also must avoid concentrated exposure to pulmonary irritants and temperature extremes." (A.R. 50.) The ALJ stated that Moore's "medically determinable impairments" could be expected to cause some of the symptoms she claimed to be experiencing, but found that her descriptions of the "intensity, persistence and limiting effects of these symptoms are not entirely credible." (Id. at 54.) The ALJ did not say which of the symptoms could be caused by the impairments, nor did she explain what level of intensity, persistence, or limitation she believed that the symptoms caused. Instead, the ALJ stated that Moore's complaints were out of proportion to the prescribed treatment, which the ALJ characterized as "conservative in nature." (Id. at 54-55.) She noted that Moore had not followed her doctor's advice to exercise, quit smoking, or reduce her Vicodin intake. (Id. at 54.) The ALJ also pointed to the lack of documentation to substantiate Moore's testimony that she once sought emergency treatment for a migraine and visited a neurologist. (Id.) The ALJ further noted Moore's unwillingness to return to a neurologist or to seek mental health treatment for her panic attacks. (Id. at 54-55.)

The ALJ determined that the opinions of Drs. Schuette and Zahtz were not entitled to controlling weight because, she found, their opinions "contrasts [sic] sharply with the other evidence of record," and because the "doctors [sic] own treatment notes fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were, in fact, disabled." (A.R. 55.) The ALJ did not say what weight she gave their opinions regarding her migraines and back pain, but she gave no weight to their evaluation of her

anxiety attacks because, she said, those opinions were "outside their areas of expertise." (Id.) The ALJ said that the physicians' course of treatment was inconsistent with "what one would expect if the claimant were truly disabled." (Id.) The ALJ gave "some weight" to the residual functional capacity submitted by a nonexamining physician employed by the State Disability Determination Services, who opined that Moore was not disabled. (Id.) In crafting the residual functional capacity, the ALJ did not analyze Moore's or the doctor's description of the side effects of her medication. (Id. at 54-55.)

Having determined Moore's residual functional capacity, the ALJ concluded that Moore is capable of returning to her past relevant work as an ophthalmology technician. (A.R. 55.) Relying on Radke's testimony that this job consists of "skilled and light work," the ALJ stated that working as an ophthalmology technician "does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Id.) The ALJ thus concluded that Moore is not under a disability as defined by the Social Security Act, and denied her applications for SSI and DIB. (Id. at 56.)

**Analysis**

In Moore's current motion for summary judgment, she attacks the ALJ's decision on multiple fronts. First, Moore argues that the ALJ did not give proper weight to the opinions of Drs. Schuette and Zahtz, Moore's treating physicians. She argues that their opinions are entitled to controlling weight, and that even if they are due less weight, the ALJ failed to explain what weight she ascribed to them and improperly drew her own medical conclusions

11

about Moore's condition. Next, Moore argues that the ALJ improperly evaluated the residual functional capacity because, according to Moore, she ignored the frequency of Moore's migraines and did not explain how her assessment matches up with Moore's limitations. Finally, Moore attacks both the ALJ's credibility assessment and her analysis of Moore's past relevant work. In responding to Moore's motion and moving for summary judgment himself, the Commissioner has utterly failed to respond to a number of these well-developed arguments. The Commissioner submitted an eight-page brief, of which just under two pages can fairly be described as analysis. Even then, the Commissioner defends his decision with not much more than blanket conclusions and recitations of the applicable burdens of proof.

Perhaps the Commissioner's incomplete response can be chalked up to reliance on the deferential standard under which this court reviews the ALJ's decision. This court asks only whether the ALJ applied the correct legal standards and reached a decision that is supported by substantial evidence. 42 U.S.C. § 405(g); *Buckner v. Astrue*, 680 F.Supp.2d 932, 938 (N.D. Ill. 2010). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). This court reviews the entire record in making the substantial evidence determination, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. On the other hand, this court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or

12

missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (internal citations omitted).

Because Moore's disability claim hinges largely on her subjective complaints about the intensity and frequency of her migraine headaches and other pain, the ALJ's adverse credibility finding is crucial, and this court begins its review there. Challenging an ALJ's credibility determination typically is an uphill battle; this court will affirm if the ALJ gives "specific reasons that are supported by the record for his finding." *Skarbek v. Astrue*, 390 F.3d 500, 505 (7th Cir. 2004). Moore argues here that the credibility finding is improper because the ALJ did not explain how her testimony was inconsistent with the medical record, did not properly evaluate the factors used to evaluate subjective pain complaints, and erroneously concluded that Moore was not following her treatment protocol. In response, the Commissioner states in a conclusory manner that the credibility finding should not be disturbed because the ALJ "expressly considered appropriate factors including the lack of sufficient objective medical evidence, medical opinion evidence of record, Plaintiff's activities, and her treatment and medications." (Def.'s Mem. at 8.)

In her decision denying benefits, the ALJ wrote that Moore's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." As the Seventh Circuit recently pointed out, this precise language is boilerplate that is regularly used in social security disability cases, and worse than

that, "it is meaningless boilerplate." *Parker*, 597 F.3d at 921-22. As the Seventh Circuit explained, an ALJ's statement "that a witness's testimony 'is not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony." *Id.* (emphasis in original) ; *see also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Indeed, here the ALJ gave this court no way to discern whether she thought Moore had lied to her doctors for years about her symptoms in an effort to obtain benefits fraudulently, whether she merely thought Moore was exaggerating all of her symptoms, or whether she thought Moore overstated some but not all of her symptoms. If it was the latter, this court cannot discern which of Moore's symptoms the ALJ disbelieved. The ALJ's finding that Moore's complaints of pain are unsupported by objective medical evidence is unhelpful, because "[a]s countless cases explain, the etiology of extreme pain often is unknown, and so one can't infer from the inability of a person's doctors to determine what is causing her pain that she is faking it." *Parker*, 597 F.3d at 922; *see also Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (noting that where a claimant's pain is "severe enough to be disabling, the fact that they have no organic cause is irrelevant"). The ALJ did not explain what objective indicators one might expect to find along with disabling migraine pain, and points to nothing in the record to support her assumption that the absence of such indicators means Moore was lying. *See Parker*, 597 F.3d at 922-923.

Because objective evidence often is lacking where a disability claim stems from complaints of pain, an ALJ is required to investigate and describe "the nature and intensity

of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities." *Zurawski*, 245 F.3d at 887 (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). It is insufficient for the ALJ to merely cite those factors; instead she must examine the full range of evidence that relates to them. *Id.* at 887-88; *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Here the ALJ points to the lack of documentation to support Moore's testimony that she once sought treatment for a migraine in an ER and visited a neurologist, but does not explain whether she concludes from that omission that those visits never happened or that the migraines never happened. (A.R. 54-55.) The ALJ also criticizes Moore's unwillingness to follow-up with a neurologist even if she could do so for free, but Moore explained that her reluctance stemmed from the fact that the first neurologist did not provide helpful treatment. *See Parker*, 597 F.3d at 922 (noting that claimant's decision not to pursue care that she considered unhelpful explains refusal to follow-up). The ALJ also noted Moore's failure to seek mental health treatment for her panic attacks and her failure to follow her doctors' advice to quit smoking, exercise, and cut back her use of Vicodin. (A.R. 54.) But Moore testified that Dr. Zahtz was treating her for panic attacks, and the record shows that her ability to access additional treatment was limited by her lack of health insurance. There is no evidence to suggest that exercise would reduce Moore's migraines (her main complaint in seeking benefits). Nor is there any evidence that Moore was taking more Vicodin than her doctor prescribed (and the record shows he cut

back on her dose over time); if anything, her persistence in taking the full dose rather than cutting back lends support to her claims that her pain was severe. But even if the ALJ's reliance on Moore's failure to follow treatment protocol were well-supported, this court still cannot tell which symptoms the ALJ believed and which she disbelieved. Simply put, the ALJ did not provide an adequate explanation of how the factors for subjective complaints of pain stack up in this case. *See Zurawski*, 245 F.3d at 887.

Turning to the ALJ's handling of the treating physicians' assessments, Moore asserts that because Drs. Zahtz's and Schuette's evaluations of her residual functional capacity are consistent, and because there are no differing opinions from other treating physicians, their opinions are entitled to controlling weight. Under the "treating physician rule," the ALJ must "give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)). But that presumption disappears if the physicians' opinions are internally inconsistent, *Schmidt*, 496 F.3d at 842, or well-supported contradicting evidence is introduced, *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). As the government points out, here the ALJ found that the treating doctors' opinions regarding Moore's limitations were not uncontroverted; a nonexamining state physician opined that Moore's migraines are not severe. The ALJ also found that Dr. Schuette's and Zahtz's assessments seem inconsistent with their course of treatment and notes. Given those

16

potential weaknesses in the treating physicians' assessments,  the ALJ was not required to give Drs. Schuette's and Zahtz's opinions controlling weight.[1]  *See Bauer*, 532 F.3d at 608.

But the ALJ's conclusion that the treating physicians' opinions are not entitled to controlling weight did not permit her to disregard them altogether, and here the Commissioner has not responded to Moore's alternative argument that the ALJ erroneously failed to explain what weight their opinions are due, or what evidence she relied on to get from the doctors' opinions that Moore's limitations are disabling to the ALJ's conclusion that Moore is able to perform light work.  The ALJ ascribed the nonexamining physician's opinion "some weight,"and noted that "as a general matter" the treating physicians' opinions are entitled to more weight, but she did not say whether in *this* matter she gave Drs. Schuette's and Zahtz's opinions more deference, and if so, what level.  From what this court can tell, she may have given them no weight—the treating physicians agreed, for example, that Moore needs to lie down throughout the day and is unable to sit for prolonged periods. Yet the ALJ's residual functional capacity assessment does not account for those limitations. Nothing in the ALJ's analysis explains that departure or builds the requisite logical bridge from her recitation of the medical evidence to her conclusion.  *See Terry*, 580 F.3d at 475. And as Moore points out, the ALJ's conclusions rest at least in part on her own medical

---

[1]  Moore's related argument that the ALJ should have recontacted the treating physicians for further explanation requires little attention.  An ALJ is only required to recontact a physician for additional evidence if she finds the record inadequate to make a disability determination. 20 C.F.R. § 404.1512(e); *Skarbek*, 390 F.3d at 504.  Here the ALJ viewed the record as unconvincing rather than inadequate.

judgment that Drs. Schuette's and Zahtz's course of treatment was "conservative." She gives no explanation for the basis of that characterization, nor does she describe what more aggressive treatment one might expect to find for a person who suffers disabling migraine headaches and other pain. An ALJ is not permitted to simply swap her own medical judgment for the treating physicians', *see Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Clifford*, 227 F.3d at 870, but given the lack of analysis applied to the medical evidence, this court cannot rule out that the ALJ did so here.

Next Moore persuasively argues that the ALJ erroneously failed to account for the limitations caused by her migraine headaches in her residual functional capacity and constructed an improper middle-ground assessment between the treating physicians' and nonexamining physician's evaluations. Specifically, Moore points out that the ALJ found she suffered from a history of migraine headaches, but did not explain how the migraines impact Moore's ability to work. An ALJ is required to discuss how she arrived at the residual functional capacity, citing record evidence to support her conclusions. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352-53 (7th Cir. 2005). The ALJ must discuss the evidence that does not support her conclusion as well as that which supports it. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (noting ALJ must discuss how claimant's headaches impact ability to work).

Here, there was record evidence from Moore, Dr. Zahtz, and Dr. Schuette explaining that Moore experienced migraines two to five times a week, and that when the migraines

occurred, she had to lie down until they passed, and even then she experienced hours of

heightened sensations and lethargy. Dr. Zahtz explained that when Moore was experiencing

a migraine, she was incapable of sitting or concentrating. Moore explained that she had been

fired from her last job because the onset of her migraines is unpredictable and because she

had to call in sick frequently. The vocational expert testified that a person who has to lie

down often or miss more than two work days per month is unemployable. Yet the ALJ

concluded that Moore can perform "light work" as long as she is limited in "stooping,

crawling, climbing, crouching, and kneeling" and avoids "concentrated exposure to

pulmonary irritants and temperature extremes." That assessment is devoid of any analysis

that matches up those limitations with the evidence regarding the severity and frequency of

Moore's migraines.[2] The Commissioner's only defense of the ALJ's assessment is to remind

the court that it is Moore's burden to prove her impairments prevent her from working and

to argue that the ALJ did not think the severity of Moore's headaches were disabling. The

Commissioner is correct that it is Moore's burden to supply evidence, but it remains the

ALJ's burden to provide a narrative discussion that explains the basis for the residual

functional capacity. *Briscoe*, 425 F.3d at 352. That discussion is missing here. The

Commissioner cites no language to support his assertion that the ALJ disbelieved the

---

[2]  The reference to "pulmonary irritants" is especially puzzling given the dearth of reference elsewhere in the ALJ's decision (or in the record, that this court can see) describing pulmonary difficulties.

evidence regarding the severity of Moore's migraines. The only such language this court can find is the meaningless boilerplate described above.

Finally, Moore argues that in concluding that she could return to her past work as an ophthalmology technician, the ALJ improperly failed to describe the requirements of that work and did not discuss how Moore could meet those requirements given her limitations. In response, the Commissioner again points to the burden of proof and argues that it was Moore's responsibility to demonstrate that she cannot perform that past work. But once again, the Commissioner conflates the claimant's evidentiary burdens with the ALJ's duty to explain her decision. In describing past relevant work, the ALJ is required to do more than consider whether the claimant can perform "light" or "sedentary" work in general—instead, she must analyze "whether she could perform the duties of the specific jobs that she had held." *Smith v. Barnhart*, 388 F.3d 251, 252 (7th Cir. 2004); *see also Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991). Here, the ALJ stated succinctly that Moore can work as an ophthalmology technician because the vocational expert testified that someone with the residual functional capacity the ALJ assigned could perform "skilled and light work activity." As far as this court can tell, the ALJ did not consider, for example, how Moore's migraine triggers and medication side effects would impact her ability to perform the specific requirements of her past work. That is an analysis the ALJ should develop on remand.

Moore's disability claim may not be air-tight, but neither is it frivolous, and it is not this court's role to substitute its judgment for the ALJ's. The court is remanding this case

because the ALJ's heavy reliance on boilerplate language and the absence of a logical bridge between the evidence and many of the conclusions—coupled with the Commissioner's tepid defense of those conclusions—are roadblocks to adequate judicial review. On remand, the ALJ must explain how the credibility factors related to pain stack up in this case, what level of deference she ascribes to the treating physicians' opinions, how Moore's symptoms match up with the residual functional capacity, and how Moore's limitations gel with the job requirements of an ophthalmology technician.

## Conclusion

For the foregoing reasons, Moore's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**